Good morning. May it please the Court, my name is Louis Palazzo and I, along with Alan Lichtenstein, represent Mr. Torlai. Based upon the Court's previous comments, I recognize that the Court has read the briefs and is familiar with the facts. The essential contention raised in our appeal centers upon the issue of calculating the loss in this case. And essentially, our position is that the District Court erred in overestimating or over-calculating the losses associated with the case itself. The jury in this case made no determination regarding how much of the acreage at issue with respect to the claims was planted. It's undisputed that there was indeed acreage planted with respect to each of the counts at issue. There was never a deduction made to credit Mr. Torlai for the acreage that was planted. There was conflicting testimony. There could be a finding that that is zero. Well, I don't know that there could be a finding of zero, Your Honor, based upon the fact that the government witnesses, as well as some of the witnesses that testified on behalf of the defense, gave conflicting testimony, but they all found that there was indeed acreage planted. Yeah. I think some of them — wasn't some of them saying that that was just an effort to make a cover-up of the overall fraud? I think that was the argument made by the prosecutor. If they found that, would he be entitled to claim that as — if it's all part of a fraud, if they find that? What then would be in — If they found that, you'd still have the issue of some of the expenses associated, the administrative and operating expenses that ended up getting Mr. Torlai above the threshold of $400,000 under the fraud loss table that caused there to be an overestimate with respect to the loss at issue. Additionally, there was a premium subsidy that was essentially unbeknownst to Mr. Torlai or any other farmer in his capacity, similarly situated, that would be aware that there's a premium subsidy paid by the government to the insurance company. So those factors combined ended up causing the threshold to be met above the $400,000 figure, which we believe overstated the level of culpability on the part of Mr. Torlai. Counsel, let me take you to the question. Let's go to the example of the acreage planted. It looks to me like most of your argument rests on the comment in the sentencing guidelines that relates to how you calculate loss against the government. And the example that's used is if you've got — if you claim $150 worth of — if you receive $150 worth of food stamps and you're entitled only to $50, then the damage is only $100, not the $150. Correct. So your argument is, look, okay, so he didn't have 600 acres planted. He only had 100 acres planted. You have to subtract the 100 acres from the 600. And once we do that, we're going to — we'll end up with at least $10,000 or $11,000. They'll get us below $400. True. And I think it goes even beyond that, Your Honor, because in this particular case, you have the Stony Creek properties that are outlined in the chart on page 16 of the United States brief that essentially outlines that payments were made in 2002 for claims relating to Stony Creek 2002 and Stony Creek 2005. At least claims were made. Those claims were withdrawn. In one instance, with respect to the Stony Creek 2002 — Right. But this is the one where he — where he claimed that he had 100 percent interest and he only had one-third interest. No, Your Honor. I think — well, that's correct. But the issue that ultimately caused him to have to withdraw the claim centered upon the fact — or the claim was denied was after the adjuster came out on behalf of the risk management agency, on behalf of the government, it was determined that, indeed, the acreage was planted, albeit not the amount that was stated or claimed originally. But in addition, when the agent — when the adjuster came back out on behalf of the government, he found that cattle was then grazing on wheat and said, listen, you didn't have permission or consent to allow the cattle to graze on the damaged crop, and so that claim is not going to be honored, and all of it ended up being a matter that was denied as a claim. With respect to 2005, Mr. Torlai attempted to gain insurance on a new crop that was planted, and they determined — the insurance company determined, listen, because you're not eligible, you haven't had insurance on this particular parcel for the three years preceding your claim, you're not eligible for insurance, so we have to deny your claim. He ended up withdrawing the claim based on that ineligibility. But yet those amounts were added in, which amounted to about $200,000 of the $410,000 or so that was found by the court. So $200,000, which also included the administrative and operating expenses, the premium subsidy, as well as the underlying claim itself, and without any deduction for the premium that Mr. Torlai would of necessity have to pay that's deducted. Did he make any payments of premiums? He did not. Those are generally paid as a deduction from the indemnity payment. At the end. But he didn't make any payment. He's not out any money. There's nothing to credit him for. True. Well, but it shouldn't be added in as a component of the loss, because the net debt indemnity payment would be less after reducing the premium. Is it money that the government has effectively fronted him? In a weird way. It gets a little complicated. It's fronted, but it's almost as if because there's so many policies that are at play at a particular time, that they sort of blend together. Let me move to a different set of questions on this. I'm trying to figure out, if he has filed an obviously phony claim, okay? He's claimed 100 percent interest. He has a one-third interest. He's claiming 600 acres. He's planted 100 acres. He's claiming he's going to harvest the crop. He's using it for grazing. He's using the land for hunting. He's using it for anything other than what the rules specify. Is the insurance policy void at that point? No, Your Honor, because those were simply arguments raised by the government. Those were not findings made. Why isn't that just fraud in the inception? Why isn't this fraud from the outset? Because I think that in earnest, Mr. Torlay was indeed seeking to plant crop. I mean, consider the fact that in 2002, he's being scrutinized by the insurance representative for the government. Well, it's pretty clear that he's planted something, but it isn't anywhere close to the numbers that he's claiming. Well, there's definitely an artificial inflation with respect to the United States. Now, artificial inflation is a little bit of an understatement. It's not even close to the numbers that he was claiming. Well, the numbers range anywhere between, hey, we know you planted 129 acres. You may have planted up to close to 300 acres, and that's all coming from the government witnesses. There's that much of a disparity. So 300 acres off of 499, for instance, isn't, I don't know that we can necessarily say that's just a glaring, you know, evidence of fraud and there was never an intention to plant. Because when he's coming under scrutiny in 2002 in Stony Creek, he yet again tries to plant in 2005. If the district court thought that this was a pretty clear case of fraud, could the government, could the district court then reasonably have said that it was the entire amount that the, that he was trying to claim? I don't think the evidence supports the contention that this was, you know, rampant fraud. I mean, I believe that clearly there's a historically, there's a number of years where Mr. Torley is planting and yielding crops and not making claims. And then you have a several years where, in fact, he does make claims. But to suggest that it's just an overall permeation of fraud and there's never any genuine intention to plant crops and yield a harvest, I think is really a mischaracterization of what transpired. Mr. Palazzo, how do you define the specific issue that is before us for decision on this record? Well, I think the specific issue is should the Court have made a determination with respect to what was legitimately planted? Do we say should or could? I think it could have based on the record, and I think it should have with respect to any evidentiary hearing that the Court could have or should have, in fact, entertained, if it, in fact, was having difficulty making a determination. But to say that he should have never made the claim to begin with on any front and say that it's all fraud and then start ramping up the numbers based on that. What's your best authority for that proposition? Just the evidence that was provided at the time of the trial. What's your authority for the legal proposition that a district court has to give credit back for? Well, I think the application notes say that. With respect to the case that we cited out of the Seventh Circuit, which is the U.S. versus Simpson. In that case, the Simpson case, the government stipulated an oral argument and conceded it, conceded the point, but it doesn't appear to be a well-established point of law. Well, I think what the proposition that that particular case stood for was to say that you always need to reduce the indemnity payment by the premium amount. And I think that's what happened. Do we know in the Simpson case whether the premium amount was paid? I believe. I'm not certain, Your Honor. My recollection is a little fuzzy on that. I believe it was either paid or was expected to be paid, and as a result, it was deducted from the net loss figure. And so I think that would hold true in the context of this case. If your client is setting out to defraud the government, even in the course of the application, he's putting the government to a lot of trouble and time, and the government is going to front his insurance premiums. Now, the government may not, that's a matter of the government sort of putting money, taking money out of one pocket and putting money into another pocket. But it sure wasn't money out of your client's pocket, and it does seem a little brazen to me that somebody who is engaging in fraud against the government can ask for credit for money that he would have paid to the government if he'd had a legitimate claim, and he would have paid it at the end of the time when he collected his insurance. Well, Your Honor, I think that ignores the historical pattern that existed with respect to Mr. Torlai. I mean, Mr. Torlai was a farmer for many, many years on a multitude of parcels. Which suggests he should have known better than to do what he did here. The issues that are presented to the Court are certainly not issues regarding guilt. We're not challenging that. I mean, there could have been some issues raised with respect to that. We're not dealing with a sophisticated farmer, and we're dealing with a farmer that is somewhat reliant upon acreage estimates that are outlined in certain documentary evidence that the government has in its possession, vis-à-vis the insurance company on previous plantings. But in this case, clearly to say that he should be responsible or is on notice of the premium subsidies and the administrative and operating expenses because it's listed in the reinsurance agreement between the government and the insurance company, and that that is incorporated by reference in the policy that's issued to the farmer, I think is a stretch, to put it mildly. Those are not something that would be reasonably foreseeable to the farmer under those circumstances. At a minimum, those expenses should have been removed from the calculus. I've actually gone over time. I intended to reserve a little time, but ---- I'll allow you a minute for rebuttal. Thank you, Your Honor. Mr. Anderson? May it please the Court. Michael Anderson on behalf of the United States. Before we begin, just to kind of set the stage of what we're talking about, the defendant got a downward variance of sentencing, and what he's asking for now would make the sentence that he got the bottom of the guidelines range. But the way he tries to get there doesn't work. The defendant went back multiple times with false claims when all he had was a limited amount of acreage at the front of the Stony Creek Ranch property that was acting as camouflage for what he was really doing on that property. So the defendant's focus on prorating that limited acreage ignores that in crop insurance, it's not just the acreage that matters. It's the type of crop, the intended use, the irrigation practice, and the cause of loss that all matter to these claims. And here the record shows that the defendant was false on all of those things. And just as a few examples, the wheat that was planted in 2005, there was testimony that there were rocks in the field that would have prevented the use of a harvester. Therefore, it couldn't have been harvested for grain like the defendant claimed. There was little or no irrigation. SCR 218 has a photograph of the rusted out well, the only well on the property. There were trash pits in the middle of the crop. Those are SCR 217. And there was a lot of evidence about hunting on the property  On top of that, you have Quimby Island, which was diluted with water at the time that the defendant said that he planted his crop. And you have Union Island, which wasn't even planted to the crop the defendant said it was. The satellite imagery showed it was in corn and alfalfa, not in safflower like the defendant claimed. So in effect, the defendant is completely false on the policies, and the acreage is only a portion of what he was misrepresenting in the course of that. And Judge Bidey had mentioned whether or not these insurance policies were bad at the inception. And in fact, the defendant was told and signed documents saying that if there were any material omissions or misrepresentations, it would invalidate the policies. There's an example of one of those documents at SCR 221 to 222. I'm sorry, the reference was again? At 221 to 222. It's a two-page document, and the second page is signed by the defendant. And that is the standard condition in the policy? A material misrepresentation voids the policy? Yes, Your Honor. So essentially, the defendant got insurance coverage for a Porsche when what he really had was an old, beat-up and uninsurable bicycle. Given those facts, the Court did not commit a clear error. The defendant ---- Could I ask you a question about the insurance premiums? We have a line of cases in our circuit that we don't like to commit conflicts among circuits. And so we bend towards following other circuits. And so I have that in mind with the Seventh Circuit case, which although the government conceded oral argument at certain portions, the holding itself is substantially at variance with what the government wants us to do in this case. How do you respond to that? Well, Your Honor ---- Is this overwhelming an idea that we couldn't go along with the Seventh Circuit so that we wouldn't commit a conflict? Your Honor, I think in this case there's a very well-developed factual record that supported the District Court's decision. The Seventh Circuit decision is not terribly elaborate as far as what the facts were. It isn't supporting the decision or the legal analysis. The decision reached by the District Court really was appropriate in this case. You have a defendant who commits, and part of it is how this case is charged. We've got false statements at the inception on acreage reports. So those are to get the insurance policy in the first place. And we also have false statements later in the claims process. How would you distinguish the Seventh Circuit case other than the statement that you believe it was wrongly decided? Well, let me try and address that with the ---- So you have the ---- in this case where the defendant goes through and files these false claims, and we know the claims are false at the end. But at the time the defendant initially gets the policy through fraud, he now owes that insurance company the amount of the premium. And he owes that money. When he later files the false claim, he's making a claim for the full amount of the indemnity payment. The fact that the insurance company takes a portion of that money and uses it to repay the money that the defendant fraudulently obtained or owed through his earlier fraudulent act doesn't diminish that he's claimed that full amount of that indemnity, and that's the loss to the insurance company. Well, the same government that is before us now was in the Seventh Circuit and made what they made. So tell me how, if you were going to write the opinion, you would ---- What would you say about the Seventh Circuit except they're wrong? Well, I might put it a little bit nicer. But, yeah, they did come to the wrong decision, at least as applied to this particular case. In that case, the fraud was stopped earlier, and there was a lot of discussion in that opinion about whether or not the individual had started the crack insurance policies for kind of an elaborate description of what the defense was in that case. And that doesn't exist in this particular case. I think, truth be told, I think it's wrong myself. But still, we try to go along with the other circuits. How would you distinguish the case, the Seventh Circuit case, other than a mutual feeling that it's wrong? The charge is we have a more developed factual record here. We also have the prior decision from this circuit in Saia Combe, which discusses credit in loss cases, which I think is maybe a little bit ---- It's not on the specific crop insurance subject, but I think it definitely instructs what the Court should do in this case. It's a similar idea. And, frankly, the numbers just work out right when we follow what the district court did in this particular case. Defense counsel also discussed the intended loss for the 2002 and 2005 claims. Just on that issue briefly, that was intended loss. The defendant went through and filed claims for those properties. The fact that he wasn't successful and got all the way through is what makes it intended loss rather than actual loss. So that should and was appropriately calculated under the guidelines. I wanted to address the premium subsidy in A&O briefly. The A&O is, despite its name, is really part of the cost of the policy. And the record is pretty clear. And the district court was able to delve in and see that in order to buy a specific policy, the A&O is calculated for that specific policy. So, really, it's a part of the purchase price of the specific policy that the  So that's what we're discussing here. And then along with the premium subsidy, which is also another portion, and then the producer premium, which the defendant never paid, is what we were just discussing before this subject. With that, if there are no further questions, I'll return the balance of my time. Roberts. Okay. Thank you. Thank you, Your Honor. Mr. Palazzo, I'm going to allow you a minute. Thank you, Your Honor. Your Honor, I note that the government exceeded that threshold by approximately $10,000 above the $400,000 figure that gets them into the additional two points under the base offense level, or just the base offense level. That amount clearly is made up by looking at the premium subsidy that was added in erroneously and the administrative and operating expenses that were added in erroneously. And those are two components that are separate and apart from the producer premium or the farmer's premium that he has to pay that is actually deducted from the indemnity in order to reach a net indemnity number. Clearly, the court added the indemnity into the gross – excuse me, the premium into the gross indemnity number and used the gross indemnity number in order to ascribe losses in this case, which we think was also inappropriate. But even looking at just the A&O expenses that a farmer really doesn't reasonably foresee because he's not really exposed to it or privy to those inner workings and the premium subsidy, those two components themselves worked $20,000 in the overall calculus. So clearly, reducing the total loss by the $20,000 gets us underneath the $400,000 threshold. And when you consider the fact that this Court, under Application Note 3D, has a series, a long string of cases that provides that interest of any kind, finance charges, late fees, penalty – penalties, amounts based on an agreed-upon return – rate of return or other similar costs are to be excluded under the loss calculation. And again, that's under Section 2B1.1, Application Note 3D. And then as the Court noted – 2B1.1? I'm sorry. 2B1.1, Application Note 3D, Your Honor. And so there's a history of cases that talk to the fact that we don't want to be adding in these additional costs when we calculate losses. And with respect to Application Note 3F, under that same section, the Court already hearkened to the Social Security scenario where, listen, you were entitled to $100. You got $150. The loss is $50, not $150, because you were entitled to the $100. And it's just – the jury never made a factual decision with respect to the legitimacy of the portion of the fields that were indeed planted and attempted to be harvested. And again, there's – it's a little disingenuous to say that he should be – that we should ascribe all of it as a loss and call it a permeation. What about the government's point that the policy was void from the inception because of material misrepresentations? Well, I don't know that it was void. I think what ultimately – Well, if there's a provision that says the material misrepresentation voids the policy, then doesn't – how do you get around that? Your Honor, I guess we really never had a determination made whether there was a material misrepresentation, because nobody – the jury never made a finding as to what was indeed planted as compared to what was claimed to have been planted or what was available to be planted. Okay. Now, can a district court make that finding himself? Can he make it in his own mind, even if he doesn't articulate it? I think that from a – from a – from a Sixth Amendment standpoint, I don't know that the court can make that kind of a determination without having the benefit of additional evidence before it. Because the state of the record as it stands, you've got too much of a variance that exists even between the government's own witnesses regarding what was planted. And to try to – to try to cast this as a complete permeation operation that was fraud, I think ignores the fact that we've got a 30-year farmer who has got a pretty decent track record, but for, you know, what we've got before us, where there was an overestimation regarding what was planted. And then some hyper-technical arguments about what percentage you truly owned versus your partners in the lease that you had issued to you. So I think that's a really hyper-technical approach that got taken at trial to try to suggest that he wasn't entitled to the 100 percent of the policy because of these issues between the partners. Mr. Palazzo. Yes, Your Honor. Do you think in order to reach the point you are asking us to reach, this Court will have to make factual determinations? No, Your Honor. Your Honor, I think that this Court can make a de novo determination and find that there was an error with respect to the starting point in the guidelines and that there should not have been included these ancillary costs that are never really deemed to be reasonably foreseeable to a farmer that's similarly situated to Mr. Torlay, namely the premium subsidy issues, the A&O expenses, and that based on the application note 3-D that I read, as well as a string of cases that this Court's already decided in the context of application note 3-D, as well as the Simpson case out of the Seventh Circuit. So those reasons are pretty compelling to say that, you know, there was clearly error in terms of the starting point and under Gall and Rita and this series of cases. So what would we do, assuming we agreed? Would we remand or would we make the calculations? I think the Court would likely remand under the circumstances. And I would ask that the Court also consider releasing Mr. Torlay in the interim because his sentence is going to expire in a matter of months. And so if the Court finds that there was an error with respect to the calculation, I certainly would hate to have him languish beyond the time period that he otherwise would be exposed with a correct calculation. And still getting the benefit of the 3553 reduction that he – that the Court saw fit to provide based upon separate, you know, reasons other than the loss calculation. Refresh my recollection. Were these issues that you're talking about, the insurance premium issue and the A&O costs, were they presented to the jury as a factual determination? No, Your Honor. How were they presented to the Court at sentencing? Is that what happens? In a very loose fashion, yes. And as I said, one of the issues, and it's in the government's brief, it was found in a reinsurance agreement that this A&O expense and this premium subsidy is referenced in a reinsurance agreement that the – that is then the portion of which is incorporated by reference in the document, the insurance policy that the insured or the farmer receives from the carrier. Well, I was just – I mean, here a certain amount of dollars were arrived at. Who arrived at those amounts, the judge or the jury? The judge. So the amount of money – the amount of money that he was liable for was not given to the jury? No, Your Honor. What ended up happening was they had a sentencing. At the sentencing, they threw in all of these numbers, in effect. They calculated the administrative and operating expenses. They calculated what is the premium subsidy involved in these types of – in these very columns. Was there a stipulation that those were the facts? No. No, there was no stipulation. In fact, what was being argued by Mr. Torley's counsel is because it becomes so difficult to make an assessment, you should look at gain. And in this case, gain was $141,000. Of course, the court did not accept that argument, but that's what the application notes say. When you do have difficulty encountered under application note 3B, that you look at gain when there's a difficulty encountered in making an assessment. I think we ought to let the government respond to this issue because if Scalia left it, we'll see, too. That's a jury question. It has to do with the amount of time he spent. Okay. Mr. Blosser, Judge Wallace would like to have the government come and respond to this argument, so let's have you take your seat. Thank you. We've given you quite a bit of extra time. We appreciate you answering the Court's questions. The question comes to mind. There may be a simple answer to it, but I'd rather ask it now than have to go back and research it myself. Here the situation is one, as I understand it, that the jury did not make the determination of this factual issue. It was the court. And I understand there are certain times when that occurs. But in this instance, the amount of money depended upon the amount of time a person was going to spend in jail. Is there or are there some cases that would say that that can be done by the court rather than the jury that was supposed to make the factual matters? I can just see Justice Scalia looking at this one and saying, why did that happen? What is the law on that issue? Yes, Your Honor. Because it doesn't increase the maximum, the statutory maximum, Booker doesn't prevent the judge from making this determination. And there's a Ninth Circuit case, Hickey 580F3-922, which is cited by the government in its brief, which addresses that issue. And what's Hickey hold? It essentially holds that the advisory guidelines post-Booker don't need to be proven to a jury. So in your view, the factual determination of the amount of the loss is included in that, not only the determination of how long he's going to spend in jail, but the factual findings that lead up to that can be made by the court? Yes, Your Honor. And, in fact, in this case, it would have certainly drawn a relevant subjection to trying to introduce all of those figures and calculations before the jury. It wasn't – it didn't have to do with the Defendant's guilt. Well, they could have – they could have handled that through an interrogatory to the jury. But the issue is, do you have to do it? And your position is that under Hickey, we've already held they don't? Correct, Your Honor. The government doesn't have to prove that to a jury. Okay. Your Honor, if I could just point out one citation in the record that might be assist in responding to one of the Defendant's arguments. At SCR 219, there is a signed certification where the Defendant understands that crop insurance is subsidized and reinsured by an agency of the United States. So he certainly was on notice. Thank you, Your Honor. We thank both counsel for the argument. Torlai is submitted.
judges: Wallace, Farris, Bybee